**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**08 C 402**

IN RE BEXTRA AND CELEBREX
MARKETING SALES PRACTICES AND
PRODUCT LIABILITY LITIGATION

Civil Case No.: _____

Related Case Number M:05-cv-01699-CRB
MDL No. 1699
Pending in the Northern District of California,
San Francisco Division

### MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM NON-PARTIES THE AMERICAN MEDICAL ASSOCIATION, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION AND THE ARCHIVES OF INTERNAL MEDICINE

Pfizer Inc. ("Pfizer") moves this Court to compel The American Medical Association ("AMA") and its publications *The Journal of the American Medical Association* ("JAMA") and *The Archives of Internal Medicine* ("AIM") (collectively, the "Journals") to produce subpoenaed documents. This Court issued the subpoenas under Rule 45(a)(2)(B) for the multi-district litigation, *In re Bextra and Celebrex Marketing Sales Practice and Product Liability Litigation*, Case No. M:05-cv-01699-CRB, MDL No. 1699 ("Celebrex® and Bextra® MDL"), pending in the United States District Court for the Northern District of California, San Francisco Division. The subpoenas seek documents related to various scientific articles that are at issue in the Celebrex® and Bextra® MDL and that were published in or submitted to the Journals, including peer review comments, draft manuscripts, and correspondence with the authors.

The Journals claim privileges that are inapplicable here and improperly refuse to produce any documents responsive to the subpoena and relevant to the Celebrex® and Bextra® MDL, other than copies of published articles and twenty-three pages of what appears to be the results of

searches for references to the published articles on an internet based search engine.  In addition, and despite the variety of privileges that the Journals claim, they have not provided a privilege log as Rule 45 requires.  Therefore, the Court should grant this Motion and order AMA and the Journals to produce the subpoenaed documents within seven days from entry of the Court's Order.

 In support of this motion, Pfizer states as follows:

**BACKGROUND**

**I.** **The Celebrex® and Bextra® MDL.**

 1. On or about May 7, 2007, Pfizer served subpoenas on the Journals through the AMA.  *See* Ex. A (Squillario Decl.); Ex. B (AIM Subpoena); Ex. C (JAMA Subpoena).  Pfizer served the subpoenas as part of ongoing discovery in the Celebrex® and Bextra® MDL.

 2. In the Celebrex® and Bextra® MDL, Pfizer is defending a variety of product liability claims involving its prescription arthritis medicines Bextra® and Celebrex®, which are known as selective cyclooxygenase-2 ("COX-2") inhibitors.  The plaintiffs in the cases allege that Bextra® and/or Celebrex® caused cardiovascular and other injuries.

 3. Bextra® and Celebrex® specifically, and COX-2 inhibitors generally, have been the subject of numerous studies and articles, many of which are published in or are submitted to scientific and medical journals, including these Journals.  *See* Exs. A, B and C.  The studies and articles concern the results of scientific studies about COX-2 inhibitors, the biology of how the medicines work, or analysis of their benefits and risks.

 4. The Journal editors may assign submitted manuscripts to academics and scientists for peer review.  *See* JAMA, Information for Authors, http://jama.ama-assn.org/misc/ifora.dtl (last visited January 12, 2008); AIM, Information for Authors, http://archinte.ama-

2

assn.org/misc/ifora.dtl (last visited January 12, 2008). The Journals' editors then review the peer

review comments and the manuscript and begin communicating with the authors about whether

the manuscript is publishable and whether changes are necessary to reflect the peer review

comments. Not infrequently, Journals reject manuscripts altogether, and the authors are then free

to solicit the manuscript to other journals. *See id.* Often, manuscripts rejected by one journal are

accepted and published in another. *See id.*

     5.     In the Celebrex® and Bextra® MDL, the methods, study results, analyses and

hypotheses presented in certain scientific journals, including JAMA and AIM are being used

against Pfizer. *See, e.g.,* Ex. D (November 19, 2007, Mem. and Order Re: Mots. to Exclude

Expert Test. at 13 (Judge Breyer's citation to Patricia McGettigan, et al. *Cardiovascular Risk*

*and Inhibition of Cyclooxygenase: A Systematic Review of the Observational Studies of*

*Selective and Nonselective Inhibitors of Cyclooxygenase 2*, JAMA 2006 Oct 4; 296(13): 633-

44)). Additionally, Plaintiffs accuse Pfizer generally of failing to publish study results, of

publishing only partial study results, of publishing study results too late, of failing to act on the

results of scientific literature, and of manipulating and withholding information from the

Journals.

     6.     Also, published study results, such as the Sowers 2005 AIM publication regarding

the Celecoxib Rofecoxib Efficacy and Safety in Comorbidites Evaluation Trial (CRESCENT),

are critical to the scientific debate for both parties. *See* James R. Sowers, et al., *The Effects of*

*Cyclooxygenase-2 Inhibitors And Nonsteroidal Anti-Inflammatory Therapy on 24-Hour Blood*

*Pressure in Patients With Hypertension, Osteoarthritis, and Type 2 Diabetes Mellitus*, 165 Arch.

Intern. Med. 161-68 (2005). The Sowers article discusses the blood pressure effects of drugs like

Celebrex® and Bextra®.  Blood pressure is one of the potential scientific explanations for some of the injuries at issue in the cases.

7.     Plaintiffs further allege that certain scientific publications put Pfizer on notice of alleged risks and that Pfizer should have acted on these publications.  An example is the 2001 publication by Debabrata Mukherjee.  Plaintiffs claim that the 2001 Mukherjee publication supports the argument that Pfizer had notice of an alleged increased risk of cardiovascular events associated with Celebrex® and Bextra®, and plaintiffs allege that Pfizer failed to warn of the alleged notice contained in the publication.  *See* Debabrata Mukherjee, et al., *Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors*, 286 JAMA 954-59 (2001).  As a result, documents related to these articles and studies, published or not, including documents relating to their review, assessment, and editing, are relevant or likely to lead to admissible evidence.

8.     In addition, the parties in the Celebrex® and Bextra® MDL will rely on expert causation testimony.  Whether a causation theory has been subject to peer review and publication, and whether it is generally accepted in the relevant scientific community, is critical to assessing an expert's reliability.  *See Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 593-94 (1993).  Scientific journals such as JAMA and AIM may have received manuscripts that contain exonerating data for Celebrex® and Bextra®, which would be relevant for Pfizer's causation defense.

9.     In *Daubert*, the Supreme Court explained that a "pertinent" consideration in determining whether expert testimony will assist the trier of fact is whether the theory or technique an expert espouses has been subjected to peer review and publication.  *Daubert*, 509 U.S. at 593.  The Court explained that publication, which is "but one element of peer review" is

not "a *sine qua non* of admissibility; it does not necessarily correlate with reliability . . ., and in

some instances well-grounded but innovative theories will not have been published . . . ." *Id.*

(citations omitted).  The Court further stated that "submission to the scrutiny of the scientific

community is a component of 'good science,' in part because it increases the likelihood that

substantive flaws in methodology will be detected." *Id.* at 593-94 (citation omitted).  Thus, [t]he

fact of publication (or lack thereof) in a peer reviewed journal . . .  will be a relevant, thought not

a dispositive, consideration in assessing the scientific validity of a particular technique or

methodology on which an opinion is premised." *Id.*; *see also A Woman's Choice-East Side*

*Women's Clinic v. Newman*, 305 F.3d 684, 694 (7th Cir. 2002) (concurring J. Coffey)

(discussing the necessity of looking behind the publication to determine why an article was

published and stating that "JAMA's peer review policy is no guarantee of reliability" for the

purpose of *Daubert*);  *Valentine v. Pioneer Chlor Alkali Co., Inc.*, 921 F. Supp. 666, 674-75 (D.

Nev. 1996) ("[I]t is serious error . . . to assume that because an article is accepted for publication,

even in a prestigious scientific journal, that the science it contains is therefore valid."); *Grippe v.*

*Momtazee*, 705 S.W.2d 551, 557 (Mo. App. E.D. 1986) ("Mere inclusion of an article in a

journal, no matter how prestigious the journal may be, does not confer acceptance and

accreditation of the opinions expressed by the author.").

## II.    The Journals' Refusal To Comply With The Subpoenas.

10.    Pfizer has tried for seven months to resolve this dispute.  Pfizer served subpoenas

for four categories of documents critical to its defense in the underlying MDL:  (1) "all

documents . . . concerning Bextra® or Celebrex®"; (2) documents related to the "decision to

publish or not publish" such manuscripts; (3) documents "regarding the peer review process or

other assessment, analysis or evaluation" of such manuscripts; and (4) documents that "identify

or constitute the names, affiliations and/or comments of each person who engaged in the peer review or other assessment, analysis or evaluation" of such manuscripts. Exs. B, C. Though not an exhaustive list, the subpoenas also identified five articles published in AIM and six articles published in JAMA of particular interest to Pfizer. *Id.*

11.    The return date on the subpoenas was June 11, 2007. *Id.* On June 7, 2007, counsel for AMA and the Journals contacted counsel for Pfizer, objected orally to the subpoenas based on privilege, and refused to produce any documents in response to the subpoenas. *See* Ex. E (Thornton Letter to Jennifer Squillario (Sept. 7, 2007)). Since then, Pfizer and the Journals have engaged in numerous telephone conferences, e-mail exchanges, and letter correspondences, including at least six telephone conferences, four letters, and six e-mails from Pfizer explaining why the documents are relevant, why the privileges claimed do not apply, and why the Journals are obliged to produce the documents.

12.    In August 2007, Pfizer persuaded the Journals to at least produce those documents over which the Journals were not claiming any privilege, while the parties continued to negotiate the privilege issues. Ex. E.

13.    On September 7, 2007, the Journals sent Pfizer a letter that lists the privileges the Journals are claiming but that does not describe the nature of the documents withheld. The Journals claim privileges under the Illinois Reporter's Privilege Act and the Illinois Medical Studies Act, and also invoke the "peer review privilege" and the "self-critical analysis" privilege. *See id.*

14.    On September 14, 2007, the Journals produced what they admitted to be a "partial production" of "non-privileged" documents. The production consisted entirely of reprints of published articles and twenty-three pages of what appears to be the results of searches for

6

references to the published articles on an internet based search engine.  The Journals failed to produce a privilege log or any further description of the documents withheld.  *See* Ex. F (Thornton Letter to Squillario (Sept. 14, 2007)).

15.    On September 21, 2007, Pfizer explained why the privileges listed in Mr. Thornton's September 14, 2007 letter do not apply to the subpoenaed documents and supplied points and authority in support.  *See* Ex. G (Squillario Letter to Thornton (Sept. 21, 2007)). Further, cognizant of the Journals' confidentiality concerns, Pfizer emphasized its interest in information, not names, thus suggesting that the Journals redact identifying information.  *See id.* Pfizer also reminded the Journals of their obligation to produce a privilege log in accordance with Rule 45(d)(2)(A).  *See id.*

16.    On October 25, 2007, Pfizer and the Journals spoke again.  *See* Ex. H (Thornton E-mail to Squillario (Oct. 26, 2007)).  The Journals claimed a privilege log was an unnecessary expense, an argument that lacks any merit both in light of Rule 45 and Pfizer's willingness to share the expense of the Journals' compliance with the subpoenas  *See* Ex. E.  AMA and the Journals claimed that Pfizer could get the information elsewhere (which it cannot), and demanded that Pfizer prove why the documents were relevant (which it already has).  *See* Ex. H.

17.    On November 14, 2007, Pfizer again urged the Journals to produce a privilege log in accordance with Federal Rule of Civil Procedure 45, noting that assertions embedded in correspondence are not a valid proxy.  *See* Ex. I (Squillario Letter to Thornton (Nov. 19, 2007)). Pfizer urged compliance with the subpoenas, which were served more than seven months ago, and indicated its intent to file a motion to compel if the Journals refused.  *See id.*

18.    On January 3, 2008, counsel spoke again in the hopes of resolving this discovery dispute.  The Journals' counsel indicated a willingness to accept Pfizer's proposal that they

produce redacted documents in exchange for Pfizer's promise not to pursue the identity of the peer-reviewers. *See* Ex. A. In a telephone conversation the next day, the Journals' counsel indicated the proposed compromise awaited the Journals' final approval. *See* Ex. A.

19.     Pfizer followed-up with the Journals on January 10, 2008 regarding the proposed compromise, but was disappointed to learn that they would not even agree to produce redacted documents. In a letter dated January 11, 2008, counsel for the Journals confirmed that the Journals would not agree to produce redacted documents. *See* Ex. J (Thornton letter to Squillario (Jan. 11, 2008)). The Journals also again objected to producing a privilege log because it would provide "a road map for [Pfizer] to undermine or circumvent" the privileges claimed by the Journals. *Id.* Counsel for the Journals also confirmed that Pfizer and the Journals have reached an impasse and addressed the timing of Pfizer's Motion to Compel. *Id.*

20.     Pursuant to Local Rule 37.2 and Federal Rule of Civil Procedure 45, counsel for Pfizer certifies that after consultation through letters and electronic correspondence and good faith attempts to discuss and to resolve this matter through telephone conversations with the Journals' counsel, Pfizer's attempts to reach an accord have failed.

## ARGUMENT

### I.     The Documents At Issue Are Relevant.

21.     As explained above, the academic and scientific debate about study results, analyses, hypotheses and biological explanations and causal relationships regarding Celebrex[®] and Bextra[®]; Pfizer's involvement in scientific publications; and Pfizer's responses to scientific publications are at issue in the product liability cases in the MDL and will be the subject of expert and fact testimony. The results of the peer review process are especially pertinent to the issues at stake because "[t]he purpose of peer review and publication is to demonstrate flaws in

methodology; therefore, the fact that defendants' experts and others independent of this litigation have criticized the methodology of some of the epidemiological studies upon which plaintiffs' experts relied is . . . evidence of the scientific community at work" and important information for a jury to hear so that it may properly weigh the evidence.  *See Lofgren v. Motorola*, No. CV 93-05521, 1998 WL 299925, at *7-8 (Ariz. Super. June 1, 1998).

22.     As this Court explained, "'parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . .'"  *Robbins v. Provena St. Joseph Med. Ctr.*, 2004 WL 502327, at *1 (N.D. Ill. March 11, 2004) (quoting FED. R. CIV. P. 26(b)).  The relevancy standard is "a very low hurdle" and a discovering party need only demonstrate that the information sought is "reasonably calculated to lead to the discovery of admissible evidence."  *Id.* at *3 (internal quotation marks omitted) (quoting *Eirhart v. Libbey-Owens-Ford Co.*, 93 F.R.D. 370, 371 (N.D. Ill. 1981)), *accord* FED. R. CIV. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to the claim or defense of any party . . . .  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

## II.     The Privileges The Journals Assert Do Not Apply To This Case.

23.     The only way the Journals can avoid producing these documents is to raise a valid claim of privilege.  The Journals have the burden of demonstrating that their claimed  privileges apply.  *See Stafford Trading, Inc. v. Lovely*, 2007 WL 1238915, at *1 (April 26, 2007 N.D. Ill.) (slip copy) (explaining that the party seeking to invoke a privilege has the burden of presenting to the court "underlying facts demonstrating its existence" (citing *Anderson v. Torrington Co.*, 120 F.R.D. 82, 85 (N.D. Ind. 1987)).[1]  To fulfill this burden, the responding party must "describe

---

[1]     *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 534 (N.D. Ill. 2000) (same); *see also Southern Union Co. v. Southwest Gas Corp.*, 205 F.R.D. 542, 550 (D. Ariz. 2002) ("[T]he burden to establish the

the nature of the withheld documents . . . in a manner that, without revealing information itself

privileged or protected, will enable the parties to assess the claim." FED. R. CIV. P. 45(d)(2)(A).[2]

24.    The Journals appear to be asserting: (1) the Illinois Reporter's Privilege Act (735

ILL. COMP. STAT. ANN. 5/8-901 *et seq*.); (2) the Illinois Medical Studies Act (735 ILL. COMP.

STAT. ANN. 5/8-2101 *et seq*.); (3) the "peer review privilege;" and (4) the self-critical analysis

privilege. *See* EX. E.  None of these privileges apply here.

### A.    The Reporter's Privilege Does Not Apply to the Subpoenaed Documents.

25.    The Illinois Reporter's Privilege Act permits a reporter to withhold the name of a

source or informant.  *See* 735 ILL. COMP. STAT. ANN. 5/8-901 ("[N]o court may compel any

person to disclose the source of any information obtained by a reporter.").  For example, in

*Cukier v. JAMA*, 630 N.E.2d 1198 (Ill. App. Ct. 1994), the plaintiff sought to compel JAMA to

disclose the source of information regarding an alleged financial conflict of interest; the basis

upon which JAMA declined to publish plaintiff's manuscript.  *See id*. at 1199.  In short, the

plaintiff sought the name of the informant, and JAMA refused to provide it.  *See id*.  The *Cukier*

court found that the reporter's privilege applied to JAMA and protected it against the compelled

disclosure of the source of the information that lead to the rejection of plaintiff's manuscript.

*See id*. at 164.

26.    Here, however, Pfizer is not interested in the source of the information.  Indeed,

Pfizer has suggested that the Journals redact source information if appropriate, particularly with

---

applicability of any privilege is on the proponent, and that burden begins with providing an adequate identification of the reasons why the privilege is warranted with respect to each and every communication and each and every document to be protected." (citations omitted); 9A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, CIVIL § 2458, at 37 (Supp. 2007) ("Whoever asserts privilege has a burden of proof when information subject to a subpoena is withheld on a claim of privilege." (citations omitted)).

[2]    Other Rules also guide the scope of discovery requests, including subpoenas, (*see* FED. R. CIV. P. 26) and empower courts to issue such orders as are necessary to compel disclosure of materials withheld in the face of a valid discovery request.  *See* FED. R. CIV. P. 37(a); *see also* WRIGHT & MILLER, *supra*, § 2459, at 42 ("The scope of production under a subpoena that is incorporated by the reference in Rule 45 to Rule 26(b) is exceedingly broad.").

respect to the identity of specific peer reviewers. *See* Ex. J. Pfizer is interested primarily in the scientific substance of the communications. The reporter's privilege does not apply to the substance. As a result, any documents the Journals are withholding on that basis should be produced.

**B.      The Medical Studies Act Peer-Review Privilege Does Not Apply to the Subpoenaed Documents.**

27.    Under Illinois law, the peer-review privilege that the Journals assert is not separate from, but, rather, arises out of, the Medical Studies Act. *See Dunn v. Washington County Hospital*, 429 F.3d 689, 693 (7th Cir. 2005) (citing the Medical Studies Act 735 ILL. COMP. STAT. ANN 5/2-2101 as the source of the peer-review privilege). The Act's peer-review privilege does not apply to the Journals' process of referring draft manuscripts to outside experts for review. The statute protects from discovery (and deems inadmissible) documents related to "a health care practitioner's professional competence, or other data . . . used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation." 735 ILL. COMP. STAT. ANN. 5/8-2101. The statute exists to "promote effective self-evaluation within the medical profession in an effort toward advancing the quality of health care" and to "encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." *Grandi v. Shah*, 633 N.E.2d 894, 897 (Ill. App. Ct. 1994); *see also Niven v. Siqueira*, 487 N.E.2d 937, 942 (Ill. 1985).

28.    Before this privilege attaches, the documents at issue, "must actually belong to a committee of a licensed or an accredited hospital or its medical staff." *Grandi*, 633 N.E.2d at 898 (citing 735 ILL. COMP. STAT. ANN. 5/8-2101). This requirement reinforces the Supreme Court of Illinois' finding that "materials in the hands of any legitimate medical society are

11

protected by the [Medical Studies] Act so long as those materials were used as part of a study or program designed to improve quality control or patient care, or reduce morbidity or mortality." *Niven*, 487 N.E.2d at 942.

29.    This privilege does not apply to the Journals because: (i) the documents do not belong to a hospital or medical staff; (ii) the Journals are not engaged in medical studies and programs designed to enhance quality control and patient care; and (iii) the Journal's peer-review process pertains to manuscripts, not physician credentialing or reducing morbidity or mortality rates at a hospital.  As a result, any documents the Journals are withholding on this basis should be produced.

**C.    The Self-Critical Analysis Privilege Does Not Apply to the Subpoenaed Documents.**

30.    The self-critical analysis privilege does not apply here.  That privilege is designed to "'protect from disclosure documents containing candid and potentially damaging self-criticism.'"  *Robbins v. Provena St. Joseph Med. Ctr.*, 2004 WL 502327, at *1-2 (N.D. Ill. March 11, 2004) (quoting Donald P. Vondergraft, Jr., Legal Development: The Privilege of Self-Critical Analysis: A Survey of the Law, 60 Alb. L.Rev. 171, 175-76 (1996)).  To apply, the court must determine that:

> (1) the information resulted from a critical self-analysis taken by the party seeking protections; (2) the public has a strong interest in preserving the free flow of the type of information sought; (3) the information is of the type of information whose flow would be curtailed if discovery were allowed; and (4) the documents were prepared with the expectation that they would be kept confidential.

*Id.* (citing *Morgan v. Union Pac. RR Co.*, 182 F.R.D. 261, 264 (N.D. Ill. 1998)).

31.    The Journals fail the first prong of the test because their evaluation of a third party's work product is, by definition, not self-critical.  They fail the second prong because the public has no interest in preserving the editorial process of a scientific journal, particularly not

12

when doing so prevents a defendant from access to potentially exonerating evidence.  Third, it is

unreasonable to conclude that scientists and academics will stop submitting manuscripts to the

Journals if they comply with the subpoenas.  As a result, any documents the Journals are

withholding on this basis should be produced.

## III.    If Any Privilege Was Valid, The Journals Waived It.

32.    For seven months, the Journals have refused to provide Pfizer with a privilege

log.  Rather, the Journals have stated that they object to the subpoena based "upon several

privileges" and, further, that:

> In a nutshell our arguments against compelled disclosure include:
>
> 1.    The Illinois Reporter's Act, 735, Ill. Comp. Stat. Ann. 5/8-901 et seq.
> 2.    The Illinois Medical Studies Act, 735 Ill. Comp. Stat. Ann. 5/8-2101 et seq.
> 3.    Case law, such as *Cukier v. American Medical Association, the Journal of Medical Association, et al.*, 259 Ill. App.3d 159 (Ill. App. 1994).
> 4.    The peer review process privilege.
> 5.    Ethical rules of confidentiality regarding the editorial process.
> 6.    Ethical and legal obligations to and among editors and peer reviewers.

Ex. E.  This does not satisfy Rule 45, which requires the Journals to "describe the nature of the

withheld documents, communications, or tangible things in a manner that, without revealing

information itself privileged or protected, will enable the parties to assess the claims."  FED. R.

CIV. P. 45 (d)(2)(A)(ii); *see also, e.g., McNally Tunneling Corp. v. City of Evanston*,  2002 WL

59115, *5 (N.D. Ill. 2002) (ordering production of a privilege log).[3]  What is more, of the six

enumerated "privileges," only two are legally recognized (the qualified reporter's privilege and

the peer review privilege arising out of the Medical Studies Act).  The other four either relate to

those (e.g., *Cuikier v. American Medical Association*, *et al.*, 259 Ill. App. 3d 159 addresses the

---

[3]    *Smithkline Beecham Corp.*, 193 F.R.D. at 534 (stating that the court directed the plaintiff to file a privilege log providing the description of each document being withheld on privilege); WRIGHT & MILLER, *supra*, §2458, at

reporter's privilege) or are merely policy considerations that do not carry the weight of law.  The

Journals' unfounded assertion of these "privileges" emphasizes the importance of a privilege log.

33.    Failure to produce a privilege log individually claiming privilege for each

document withheld constitutes waiver.  *See In re Application for Subpoena to Kroll*, 224 F.R.D.

326, 328 (E.D.N.Y. 2004) (stating the Federal Rule of Civil Procedure 45 requires a privilege log

and that failure to produce such a log constitutes waiver of the claimed privileges).[4]  As a result,

the Journals must produce the documents.  *See, e.g., Smithkline Beecham Corp. v. Apotex Corp.*,

193 F.R.D. 530, 534 (N.D. Ill. 2000) (determining that because the plaintiff failed to file the

ordered privilege log, the withheld documents must be produced).

WHEREFORE, for the foregoing reasons, Pfizer respectfully requests that this Court grant its

Motion to Compel and order the Journals to produce documents in accordance with the

subpoenas within seven days from the date of the Order, and award Pfizer reasonable costs,

including attorneys' fees.

Dated:  January 17, 2008

Respectfully submitted,

**PFIZER INC.**


/s/Matthew J. Sullivan
By:  Matthew J. Sullivan

John W. Christopher
Matthew J. Sullivan
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL  60601

---

37 ("Courts have consistently held that . . . [a party resisting disclosure of documents on a theory of privilege] is required to produce a document index or privilege log."  (citations omitted)).

[4]    WRIGHT & MILLER, *supra*, §2458, at 37 ("Courts consistently have held that . . . the failure to produce a [privilege] log of sufficient detail constitutes a waiver of the underlying privilege claim."  (citations omitted)).

(312) 558-5600 (ph)
(312) 558-5700 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew J. Sullivan, attorney for Pfizer Inc. herby certify that I have caused a copy of the foregoing to be served on the following counsel by hand delivery:

>    Joseph P. Thorton
>    Editorial Counsel
>    JAMA & Archives Journals
>    American Medical Association
>    515 N. State Street
>    Chicago, IL  60610

on this January 17, 2008.

>    /s/ Matthew J. Sullivan
>    Matthew J. Sullivan

16