## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

IN RE BEXTRA AND CELEBREX
MARKETING SALES PRACTICES AND
PRODUCT LIABILITY LITIGATION

Civil Case No:  08-CV-00402

Related Case Number M:05-cv-01699-CRB
MDL No. 1699
Pending in the Northern District of California
San Francisco Division

### RESPONSE OF THE AMERICAN MEDICAL ASSOCIATION TO PFIZER, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Pfizer's motion demands material to which it is not entitled, and which it does not need. The underlying subpoenas, and Pfizer's motion to compel, arise from a multi-district litigation (MDL) class action concerning the marketing of drugs known as Bextra and Celebrex.  The American Medical Association ("AMA") is not a party to any of these more than 3,000 lawsuits, but has published medical research studies pertaining to the safety of these drugs in two of its peer-reviewed journals, *The Journal of the American Medical Association*, known as **JAMA®**, and the *Archives of Internal Medicine* ("AIM").  Pfizer directed to the AMA two subpoenas concerning these articles, and now is attempting to compel discovery of confidential unpublished material pertaining to these articles and other submissions.

The AMA has complied with Pfizer's request that it produce copies of certain articles published in JAMA or AIM.  The remaining material Pfizer seeks, however, consists of possible rejected manuscripts, confidential editorial judgments, and analyses by the AMA journals' editors and their medical peer reviewers about these published articles and other papers.  These investigative, quality-control functions — intended as they are to improve patient care and reduce morbidity and mortality — are protected from discovery by the plain language of both the

Illinois Medical Studies Act, 735 ILCS § 5/8-2101 *et seq.*, and the Illinois Reporter's Privilege, 735 ILCS § 5/8-901 *et seq.*[1]

Even if this material were not privileged, Pfizer still would not be entitled to it. The underlying multi-district litigation advances claims of consumer fraud, not product liability. The MDL plaintiffs' claims will therefore turn on what Pfizer allegedly knew but failed to disclose to consumers and their physicians about Bextra and Celebrex. By definition, manuscripts and commentary kept confidential by AMA's journals could not have been known to Pfizer or played any role in its advertising and marketing decisions. Likewise, the plaintiffs in these actions could not have known about and relied upon unpublished documentation in making their drug-purchasing decisions. The dubious probative value of these materials to Pfizer is therefore far outweighed by the damage compliance with the subpoenas would cause to the integrity of medical research and the quality of future medical care.

This Court should deny Pfizer's motion.

## FACTS

### A.    The American Medical Association, and its Journals

The American Medical Association, an Illinois not-for-profit corporation headquartered at 515 North State Street, Chicago, Illinois, is dedicated to the promotion of the science and art of medicine and the betterment of public health. (Declaration of Catherine D. DeAngelis, MD, MPH ¶ 8). Formed in 1847, the AMA currently is the largest association of physicians and medical students in the United States. (*Id.*). The AMA works to advance principles of patient advocacy, ethics, education, professionalism, standard setting, and quality of patient care. (*Id.* ¶¶ 9–10).

---

[1] Pfizer's motion claims, wrongly, that the AMA has separately asserted a "peer review privilege" and a "self-critical analysis privilege." (Pfizer Motion ¶ 13).

*The Journal of the American Medical Association* ("JAMA") brings the latest medical research studies and findings to physicians and scientific investigators across the globe. First published in 1880, JAMA is the most widely circulated medical journal in the world, distributed in nine languages and 132 countries. (*Id.* ¶ 11). The *Archives of Internal Medicine* ("AIM") is the oldest and largest of nine specialty medical journals in the JAMA family of Archives Journals. (*Id.*). Both journals are published in Chicago. (*Id.*).

JAMA is a general medical journal that publishes scientific articles, commentaries, and news involving all fields of medicine, including medical research, significant clinical observations, diagnostic and therapeutic developments, legal and social matters of interest to physicians, and issues of medical ethics. AIM appeals to physicians who specialize in Internal Medicine, currently the largest subspecialty of physicians in the United States. (*Id.* ¶ 12).

JAMA's motto, "To promote the science and art of medicine and the betterment of the public health," is published in every one of its 48 issues annually. JAMA strives to give physicians the most reliable medical information, including studies of morbidity and mortality, to help them diagnose and treat their patients. (*Id.* ¶ 13). AIM has a similar mission: "To promote the art and science of medicine and the betterment of human health by publishing manuscripts of interest and relevance to internists practicing as generalists or as medical subspecialties." (*Id.* ¶ 14).

### B.    The Peer-Review Process and its Importance

All papers published in JAMA and AIM, including those sought by Pfizer in this motion, are first subjected to peer review. (*Id.* ¶ 17). In the peer review process, a committee of individuals with expertise in the subject matter of a given paper review its soundness, methodology, data, and conclusions. (*Id.* ¶ 18). Both JAMA and AIM guarantee the confidentiality of their peer reviewers and other individuals who may provide information to

these journals in the course of the editorial process. (*Id.* ¶ 19). Peer reviewers are urged to make frank and candid comments regarding the clarity, structure, and conclusions of the paper, as well as its contribution to the medical literature and potential significance to its area of medicine. (*Id.* ¶ 21).

The candor and trust essential to the peer review process, and its association with the production of top-quality medical literature, would be threatened if these confidential assessments were released into the public domain. (*Id.* ¶ 25). There would be little incentive for the nation's finest medical doctors to offer candid assessments of their peers' works, anonymously or otherwise, if their work product were subject to the whim of litigants. (*Id.*). It is the opinion of JAMA's Editor-in-Chief, herself a peer-reviewer for other journals, that the public disclosure of these sensitive medical analyses would lead to the decline of peer review, and an accompanying decline in the quality of published medical studies and medical care. (*Id.* ¶¶ 25–29).

C.     **The Underlying Multi-District Litigation.**

Multi-District Litigation (MDL) Docket No. 1699 was created on September 8, 2005, with proceedings continuing under Case No. M:05-cv-01699-CRB in the United States District Court for the Northern District of California. The MDL arises from allegations that Pfizer advertised and marketed the prescription drugs Bextra and Celebrex as likely to provide pain relief without the side effects that had accompanied earlier anti-inflammatory medications. (Third Amended Purchase Claims Master Bextra Complaint ("Bextra Complaint") ¶¶ 6–19, attached hereto as Ex. **A**; Third Amended Purchase Claims Master Celebrex Complaint ("Celebrex Complaint") ¶¶ 6–20, attached hereto as Ex. **B**). The MDL plaintiffs further contend that these representations were false, and that Pfizer knew these representations were false. (*E.g.*, Bextra Compl. ¶¶ 138–142; Celebrex Compl. ¶¶ 222–226).

The substantive claims advanced in the MDL relate exclusively to alleged violations of state consumer protection laws addressing deceptive representations to consumers, alleged reliance of the plaintiffs upon those representations, and alleged unjust enrichment of Pfizer arising from those relied-upon representations. (Bextra Compl. ¶¶ 154–171; Celebrex Compl. ¶¶ 238–255). The complaints do not advance claims of negligence or strict products liability.

### D.     Events Leading up to this Motion.

The documents attached to Pfizer's motion largely speak for themselves, obviating the need for the AMA to respond to Pfizer counsel's attempt to characterize the repeated, and futile efforts of the AMA to address Pfizer's subpoenas.

The AMA agreed to produce numerous _published_ articles regarding Bextra and/or Celebrex. (Production Letter of J. Thornton, Pfizer Motion Ex. F). The AMA, however, has also consistently objected to the remainder of Pfizer's subpoenas, and on September 7, 2007, memorialized its assertions of privilege in writing, in addition to objections under Federal Rules of Civil Procedure 26 and 45(c). (Pfizer Motion Ex. E). A categorical description of the documents withheld as privileged was provided last month. (Pfizer Motion Ex. J). The AMA has continued to act in good faith in explaining its opposition to the subpoenas' demand for documents reflecting editorial judgments, unpublished manuscripts, and confidential communications among journal editors and peer-reviewers. (Pfizer Motion Exhibits E, H, & J).

## ARGUMENT

I.     **THE EDITORIAL AND PEER-REVIEW MATERIALS SOUGHT BY PFIZER ARE PRIVILEGED FROM PRODUCTION UNDER THE ILLINOIS MEDICAL STUDIES ACT, 735 ILL. COMP. STAT. § 5/8-2101** _et seq._

### A.     The Medical Studies Act, and its Requirements.

In 1982, the Illinois legislature passed the current Medical Studies Act or "MSA," 735 ILCS 5/8-2101 _et seq._ The MSA was intended to encourage the medical profession to engage in

effective self-evaluation of its peers and their work in the interest of advancing the quality of

health care, reducing disease, and preventing deaths. *Roach v. Springfield Clinic,* 623 N.E.2d

246, 251 (Ill. 1993). The MSA achieves these purposes by making privileged or otherwise

confidential all information of certain health organizations that is used in certain ways, such as

for internal quality control or for medical studies intended to reduce morbidity (the prevalence of

incidences of disease) or mortality (the proportion of deaths to population). The Legislature

believed that absent such a privilege, health care professionals would be reluctant to undertake

peer review and engage in honest and frank evaluations of both their colleagues and their

colleagues' work and research. *Id.*

The burden of establishing the privilege is on the party seeking to invoke it. *Id.*

Information protected by the MSA is not discoverable in any action of any kind in any court or

before any tribunal, board, agency, or person. 735 ILCS 5/8-2102. According to the MSA:

> All information, interviews, reports, statements, memoranda, recommendations,
> letters of reference . . . or other data of the . . . Illinois State Medical Society [or]
> allied medical societies, . . . used in the course of internal quality control or of
> medical study for the purpose of reducing morbidity or mortality, or for
> improving patient care . . . shall be privileged, strictly confidential and shall be
> used only for medical research . . . [or] the evaluation and improvement of quality
> care.

735 ILCS 5/8-2101.

The plain text of the MSA therefore imposes three requirements: (1) the potentially

protected material must be in the possession of a specific kind of organization ("organization

requirement"); (2) the potentially protected material must fall within a certain category

("category requirement"); and (3) the material must be used in a certain way ("use

requirement"). The "organization requirement" directs that applicable material must be used by

a protected organization, including any "allied medical societies." *Id.* The category requirement

protects "any information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of the specified organizations." *Id*. The "use requirement" directs that the specified categories of materials be put to certain uses. These uses include "internal quality control or [] medical study for the purpose of reducing morbidity or mortality, or for improving patient care." *Id.*

      B.    <u>As an "Allied Medical Society," the AMA's Materials Relating to Medical Study are Privileged Under the Medical Studies Act.</u>

The manuscripts sought by Pfizer, along with the peer-review analyses and editorial judgments made by the AMA's journals pertaining to those manuscripts, all fall within the auspices of the MSA.

First, the AMA is an "allied medical societ[y]" under the MSA because, as discussed above, the mission of the AMA and its journals is to reduce morbidity and mortality and improve patient care. The instructive case in this regard is *Niven v. Siqueira*, 487 N.E.2d 937, 942 (Ill. 1985).[2] In *Niven*, the Illinois Supreme Court found that the Joint Commission on Accreditation of Hospitals was entitled to the protections of the MSA. Construing the statute's reference to protection of "allied medical societies," the Illinois Supreme Court concluded that this phrase extended to medical organizations whose missions encompass the goals of the MSA. *Id.* at 942. Therefore, under the MSA, "materials in the hands of any legitimate medical society are protected by the Act so long as those materials were used as part of a study or program designed to improve quality control or patient care, or reduce morbidity or mortality." *Id.* at 942.

---

[2] A state supreme court's construction of its own law is binding on this Court. *Heidelberg v. Illinois Prisoner Review Bd.*, 163 F.3d 1025, 1027 (7th Cir. 1998).

Furthermore, the AMA's Journals, and its peer-review process, plainly foster the purposes of the MSA for an approved "use" under the statute. The mission of the AMA's journals is to publish information that will improve the quality of patient care and reduce morbidity and mortality among patients. (DeAngelis Decl. ¶¶ 13, 14). Quality control for these efforts and the medical findings themselves are provided by the peer-review process, which allows reviewers to express candid judgments about medical studies such as those concerning the effectiveness and safety of drugs <u>before</u> they are approved for publication, again with the goal of improving patient care. (*Id.* ¶¶ 13–15, 18). Similarly, the category requirement — covering any data, information, interviews, reports, statements, memoranda, or recommendations — easily encompasses all of these materials, which Pfizer seeks in its motion. For these reasons, the AMA (and its journals) are (1) an approved organization (2) seeking protection for appropriate materials (3) generated in the course of approved activities under the MSA. The MSA therefore protects the AMA's confidential, medical quality-control documentation from these subpoenas.

Pfizer's arguments to the contrary should be rejected. First, Pfizer claims that the MSA applies only to hospitals and their medical staff. (Pfizer Motion ¶ 29). As discussed above, both the plain language of the MSA and *Niven* say exactly the opposite. The Appellate Court case cited by Pfizer, *Grandi v. Shah*, 633 N.E.2d 894, 898 (Ill. App. Ct. 1994), described the MSA as applying to hospitals and their staff only because a hospital was the entity at issue in that case. The applicability of the MSA to allied medical societies was not presented.[3] Even if *Grandi* could be construed otherwise, the Illinois Supreme Court's decision in *Niven* controls. *See Heidelberg*, 163 F.3d at 1027.

---

[3] The AMA is also an "allied" medical society in the sense that the AMA helped found the Illinois State Medical Society (DeAngelis Decl. ¶ 8), an organization specifically identified by the MSA as entitled to protection. The AMA is further "allied" with the Joint Commission on Accreditation (*id.*), the entity found to be a protected medical society in *Niven*.

Second, Pfizer claims that the AMA and its journals are not engaged in activities relating to medical quality control and patient morbidity and mortality. (Pfizer Motion ¶ 29). Pfizer is wrong. As stated above, the peer-review process is both the goal and the mechanism of the AMA journals' internal quality controls: to reduce patient morbidity and mortality through dissemination of the latest medical information to practicing physicians and researchers. Bluntly, if the Journals were *not* publishing materials on such subject matters, Pfizer would not be so vehemently pursuing these subpoenas. Underscoring this fact, Pfizer used a published JAMA article (a copy of which was provided to Pfizer by the AMA in response to one of these subpoenas) to persuade the MDL judge to agree with the author that "in doses of around 200 mg/d, [Celebrex] was not associated with an increased risk" of heart attacks and strokes — a classic resolution of a morbidity issue. (Memorandum and Order, Pfizer Motion Ex. D).

## II. THE EDITORIAL AND PEER-REVIEW MATERIALS SOUGHT BY PFIZER ARE PRIVILEGED FROM PRODUCTION UNDER THE ILLINOIS REPORTER'S PRIVILEGE, 735 ILL. COMP. STAT. § 5/8-901 *et seq.*

### A.    The Illinois Reporter's Privilege, and its Requirements / Procedures.

The Illinois Reporter's Privilege Act, 735 ILCS 5/8-901 *et seq*., further protects the materials sought by Pfizer. It states, "No court may compel any person to disclose the source of any information obtained by a reporter except as provided in Part 9 of Article VIII of this Act." 735 ILCS 5/8-901. When this privilege is invoked, the burden shifts to the party seeking discovery, who must apply to the court to divest the privilege. 735 ILCS 5/8-903(a).

The Act permits divestiture of the reporter's privilege only if specific statutory showings, through a multi-step process, have been made at an evidentiary hearing. 735 ILCS 5/8-903 through 8-907. First, a party must claim the privilege, as the AMA has since September 2007. Second, the party seeking discovery must then apply to the court to divest the privilege, by showing, among other things, that all other available sources have been exhausted and that

disclosure of the information is essential to the public interest. *People v. Pawlaczyk*, 724 N.E.2d 901, 908 (Ill. 2000).

      **B.**    <u>As a "Reporter" Publishing a "News Medium," the AMA is entitled to the Protections of the Reporter's Privilege, which Pfizer has not Overcome.</u>

      The privilege provided by the Illinois Reporter's Privilege Act applies to the AMA, and therefore by extension to JAMA and AIM, because their editors are reporters under the act, the journals are news mediums, and manuscript authors and peer reviewers and their comments on these manuscripts are sources. Further, Pfizer has not pled, nor could it plead, allegations sufficient to divest these sources of the privilege.

      **1.**    **The Reporter's Privilege Applies.**

      "No court may compel any person to disclose the source of any information obtained by a reporter." 735 ILCS 5/8-901. Section 8-902 defines "reporter," "news medium," and "source" as used in the act (where "news medium" is used in the definition of "reporter"). "Reporter" and "news medium" are not at issue because the Illinois Appellate Court has held that the AMA (and its journal editors) meet the definitions of those terms under the Reporter's Privilege Act. *Cukier v. American Medical Association*, 630 N.E.2d 1198, 1201 (Ill. App. Ct. 1994). Because the privilege applies, the only question is what constitutes a "source."

      Pfizer claims that "source" under the reporter's privilege applies only to personal identities, and that a reporter's private notes and mental impressions are therefore discoverable. (Pfizer Motion ¶ 26). Pfizer is incorrect. "'Source' means the person or *means* from or through which the news or information was obtained." 735 ILCS 5/8-902(c) (emphasis added). Documents and other tangible materials like photographs are therefore also privileged "sources" under the Act. *People v. Slover*, 753 N.E.2d 554, 557–58 (Ill. App. Ct. 2001). Tellingly, "the legislature did not limit the scope of section 8-901 of the Code by inserting either 'the name of'

or 'the identity of' before 'the source of any information." *Slover*, 753 N.E.2d at 557–58.  The reporter's privilege in Illinois protects unpublished material even when the identity of the source's author is public knowledge.  *Id.* (quashing demand for photographs taken by known newspaper photographer); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.* 455 F. Supp. 1197, 1204 (N.D. Ill. 1978).

Similarly, when an editorial staff member at one of the AMA's journals obtains information by means of a manuscript submission; comments, evaluations, or edited drafts of peer-reviewers; or editorial judgments of fellow staff members, such materials are a "source" under the Reporter's Privilege Act.  The reporter's privilege therefore protects these materials and their use, revision, or rejection by AMA's journal editors.

> ### 2.     Pfizer Has Not Pled Allegations That Would Permit the Court To Grant A Divestiture of Privilege.

Pfizer has made no effort to satisfy the multi-step process required to divest the AMA and its journals of the protections of the reporter's privilege.  First, Pfizer has not applied to the Court for divestiture as required by Section 8-903, much less provided any of the required information in such an application.  This failure is properly viewed as a forfeiture of that opportunity.  Second, even if Pfizer had applied to divest the privilege, it could not support such an application.  Section 8-907(2) requires that the party seeking discovery must exhaust "all other available sources of information" before seeking to compel a reporter's testimony or the production of his/her source material.  Further, Section 8-907(2) requires the Court to find that compelled disclosure of the reporter's observations and sources is "essential to the protection of the public interest involved," before the Court can rule that the statutory privilege must yield.  Pfizer has not alleged that it has exhausted "all other available sources of information," nor can Pfizer show that disclosure is "essential to the protection of the public interest involved."

To the contrary, the only evidence before this Court concerning the public interest is the public's manifest interest in ensuring quality medical care and reduced morbidity and mortality, a mission best served by the ability of the AMA's journals to publish medically accurate studies resulting from the candor of the nation's finest medical doctors committed to improving the work product of their colleagues.  Pfizer's efforts to compromise this protection would harm, rather than serve, the public interest by discouraging peer review and the candid exchange of views on medical studies regarding the benefits and risks of new drugs or new uses for drugs.

Because Pfizer's motion is not a proper request for divestiture under Sections 8-903 and 8-907, its motion cannot overcome the protection of the Illinois Reporter's Privilege.

## III.    THE AMA PROVIDED ADEQUATE NOTICE OF ITS ASSERTED PRIVILEGES.

As an apparent afterthought, Pfizer contends that the AMA has waived its privileges by failing to provide what Pfizer deems to be an adequate "privilege log."  (Pfizer Motion ¶¶ 32–33).  Pfizer makes this argument even though the parties had reached an explicit "stand down" agreement over the subpoenas, and the need for the AMA's compliance with them, during their many months of discussion after the subpoenas were first served.  (Pfizer Motion, Exhibit E).

The placement of this argument at the end of Pfizer's motion is no coincidence.  Contrary to Pfizer's suggestion, Federal Rule of Civil Procedure 45 says nothing about a "privilege log." What Rules 26 and 45 expect is that the party asserting a privilege will "describe the nature of the withheld documents . . . in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."  As the Advisory Committee Notes make clear, "The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege."  FRCP 26 Advisory Committee Notes 1993

Amendments 26(a)(5)(b).[4]  *See also Muro v. Target Corp.*, No. 04C6267, 2007 WL 3254463, at

*12 (N.D. Ill Nov. 2, 2007) (unpublished decision).  The Seventh Circuit has not addressed the

question of the nature and form of the privilege notice required by these rules.  The Ninth

Circuit, however, recognizes that while "a privilege log is *sufficient* to properly assert the

privilege, [it has not held] that it is *necessary* to meet those requirements."  *Burlington Northern

& Santa Fe Railway Company ("BNSF") v. U.S. District Court for the District of Montana*, 408

F.3d 1142, 1148 (9th Cir. 2005).  The specific nature of the notice requirement "is explicitly left

indeterminate."  *Id.* at 1147.

This is not a case in which anyone disputes what materials are privileged.  From the

beginning, the AMA has made clear that it considers documentation pertaining to its manuscript

receipt, handling, and review process to be privileged, and that it cannot provide an itemized

listing of that material without revealing privileged information about each document's

substance and purpose.  A description of the protected documents by category was provided last

month (Pfizer Motion Ex. J), and Pfizer's motion does not contend that it lacks information

sufficient to advance its position.  In fact, the strident tone of Pfizer's motion suggests exactly

the opposite.  The AMA has appropriately complied with Rule 45.  The very serious issues at

stake on this motion should not turn upon procedural games of "gotcha" unrelated to the merits.

IV.    **THE MATERIALS PFIZER SEEKS, EVEN IF NOT PRIVILEGED, LACK
       SUFFICIENT PROBATIVE VALUE TO OVERCOME THE PUBLIC INTEREST
       IN PRESERVING THE CONFIDENTIALITY OF THE AMA JOURNALS' PEER
       REVIEW PROCESS.**

Federal Rule of Civil Procedure 26(b)(2)(C)(iii) permits the Court to deny a request for

discovery when "the burden . . . of the proposed discovery outweighs its likely benefit."  Non-

_____

[4]  The language of Rule 26(b)(5)(A)(ii) and Rule 45(d)(2)(A)(ii) regarding claims of
privilege is identical and the subsections of these Rules have the same purpose.  Thus, the
Advisory Committee Notes are applicable to both.

party status is a "significant factor to be considered in determining whether the burden imposed by a subpoena is undue." *Ligas v. Maram*, No. 05 C 4331, 2007 WL 4225459, at *5 (N.D. Ill. Nov. 27, 2007) (unpublished opinion) (citation omitted).  Interests with social value are weighed more heavily than "purely private interests."  *Marrese v. American Academy of Orthopaedic Surgeons*,  726 F.2d 1150, 1159 (7th Cir. 1984), *rev'd on other grounds*, *Marrese v. American Academy of Orthopaedic Surgeons*,  470 U.S. 373 (1985).

Here, the probative value of the documents Pfizer seeks is virtually non-existent.  As noted, the claims advanced in the subject MDL allege consumer fraud and unjust enrichment, not strict liability or design defect.  The allegations specifically concern the truthfulness of representations that Pfizer <u>actually made</u> in light of Pfizer's <u>actual knowledge</u> allegedly demonstrating the falsity of those representations.  It would be impossible for either Pfizer or the MDL plaintiffs either to have used or relied upon internal AMA journal documentation kept confidential from the public.  Pfizer itself seems unable to explain why it needs these documents, aside from speculation that the AMA "may have received" articles it did not publish that could possibly be helpful to Pfizer in impeaching an unspecified expert.  (Pfizer Motion ¶ 8).[5]

Conversely, the impact of complying with the subpoena upon the AMA, a non-party to the MDL, would be heavy.  As stated above, the peer-review process goes to the very essence of why the AMA and its journals exist and operate.  The significance of compromising that mission is great.  If the AMA discloses the materials Pfizer seeks, physicians will be discouraged from participating in the peer review process for fear of being the objects of civil litigation.  The entire peer-review process, and its consequent quality output, in the form of peer-reviewed

---

[5] While Pfizer suggests otherwise (Motion ¶ 8), it is difficult to believe that anonymous comments of unknown authorship and qualification would even be admissible under *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 593–94 (1993), much less useful in impeaching other experts under that standard.

publications, likely would deteriorate or disappear. The resulting harm would be to physicians and their patients worldwide who depend on accurate information about medical advancements and knowledge of potential dangers from peer-reviewed literature. (DeAngelis Decl. ¶¶ 25–29).

## CONCLUSION

This dispute is as unnecessary as it is unfortunate. The confidential materials Pfizer seeks are not important to the claims advanced in the underlying MDL. Even if Pfizer's demands for these materials were reasonably calculated to lead to the discovery of admissible evidence, which they are not, the AMA journals' file materials pertaining to the receipt, handling, and review of manuscripts are protected by the Illinois Medical Studies Act, and in the alternative, by the Illinois Reporter's Privilege.

The Court should affirm the AMA's vital interest in disseminating the best available medical knowledge to medical practitioners worldwide, and deny Pfizer's motion.

Dated: February 29, 2008        Respectfully submitted,

s/ Jonathan Judge

Matthew C. Crowl
Jonathan Judge
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606
Phone: (312) 258-5500
Fax: (312) 258-5600
mcrowl@schiffhardin.com
jjudge@schiffhardin.com

Joseph P. Thornton, JD
Editorial Counsel, JAMA & Archives Journals
AMERICAN MEDICAL ASSOCIATION
515 N. State Street
Chicago, IL 60610
Tel  312-464-4609
Fax  312-464-4073
joseph.thornton@jama-archives.org

**Attorneys for The American Medical Association**

**<u>Certificate of Service</u>**

The undersigned, an attorney, hereby certifies that he caused to be served a copy of the foregoing to the following via notice provided through the ECF system, on February 29, 2008:

John W. Christopher
Matthew J. Sullivan
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (phone)
(312) 558-5700 (fax)
jchristopher@winston.com
msullivan@winston.com

s/ Jonathan Judge
_____
Jonathan Judge