*CA*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE BEXTRA AND CELEBREX MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | ) Case No. 08 C 402<br>)<br>)<br>) Judge Joan Humphrey Lefkow<br>) Magistrate Judge Arlander Keys<br>) |

## MEMORANDUM OPINION AND ORDER

Pfizer Inc., a pharmaceutical conglomerate, is currently embroiled in Multi-District Litigation in San Francisco over its prescription arthritis medications, Bextra and Celebrex. Bextra and Celebrex are non-steroidal anti-inflammatory pain medications; they reduce pain by blocking the body's production of certain pain transmission enzymes called cyclo-oxygenase-2 or COX-2 enzymes.

Pfizer is before this Court seeking to compel the production of documents from two entities that are not parties to the MDL, the Journal of the American Medical Association (JAMA) and the Archives of Internal Medicine (AIM)(herein collectively referred to as the Journals). Pfizer claims that it needs certain discovery from the Journals to defend itself in the MDL suits – namely, information, analysis and evaluations relating to articles about Bextra and Celebrex that were published, or submitted for publication, in the Journals. Pfizer sought and obtained subpoenas, issued in this district on May 5, 2007,

requesting four broad categories of documents from the Journals. First, Pfizer requested "all documents regarding manuscripts submitted for publication to [JAMA or AIM], whether accepted or rejected, concerning Bextra or Celebrex"; second, Pfizer requested "all documents regarding the decision to publish or not publish any manuscripts submitted for publication to [JAMA or AIM], whether accepted or rejected, concerning Bextra or Celebrex"; third, "all documents regarding the peer review process or other assessment, analysis or evaluation of any manuscripts submitted for publication to [JAMA or AIM], whether accepted or rejected, concerning Bextra or Celebrex"; and fourth, "all documents which identify or constitute the names, affiliations and/or comments of each person who engaged in the peer review or other assessment, analysis or evaluation of any manuscripts submitted for publication to [JAMA or AIM], whether accepted or rejected, concerning Bextra or Celebrex . . . ."[1] See Pfizer's Motion to Compel, Exhibits B and C. In the subpoenas, Pfizer specifically identified 11 articles of particular interest, though the list was not intended to be exhaustive. See id.

---

[1]Pfizer has represented in these proceedings that it is not seeking the "source" of any of the information contained in peer review comments or other analyses. Accordingly, the Court assumes that Pfizer has backed off substantially from this fourth request and is now seeking just the comments, not the names or the affiliations of any reviewers or evaluators.

The Journals initially declined to produce anything in response to the subpoenas, claiming that all of the requested documents and information was privileged.  In September 2007, however, the Journals produced reprints of published articles and a 23-page document that appeared to Pfizer to be some sort of Internet search results report.  Pfizer and the Journals continued to negotiate the privilege issues, with Pfizer claiming that the various privileges invoked by the Journals did not apply, and the Journals refusing to provide a privilege log or any additional information.  Unable to persuade the Journals to produce anything further, Pfizer filed a motion to compel, which has now been fully briefed.

### Discussion

In federal court, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ."  Fed. R. Civ. P. 26(b)(1). Discovery may be obtained from non-parties, and Pfizer employed the proper vehicle for securing documents from the Journals - a subpoena, issued in accordance with Federal Rule of Civil Procedure 45.  But the Court has broad discretion in deciding whether to compel discovery and may appropriately deny it when it would oppress or unduly burden the person or entity to whom the request was made. *See, e.g.*, Fed. R. Civ. P. 26(c); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998).  The

3

Journals' non-party status is a significant factor to be
considered in determining whether the burden imposed by the
subpoenas is undue, but it is not, in itself, dispositive. *U.S.
v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 WL 3111972, at
*4 (N.D. Ill. October 21, 2005). The Court must still balance
Pfizer's interest against the Journals' interest; and, in doing
so, the Court considers such factors as relevance, the need of
the party for the documents, the breadth and specificity of the
document request, and the degree of burden imposed by the request
on the subpoenaed party. *See, e.g., Northwestern Memorial
Hospital v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004); *Bond v.
Utreras*, No. 04 C 2617, 2006 WL 1806387, at *4 (N.D. Ill. June
27, 2006); *Patterson v. Burge*, No. 03 C 4433, 2005 WL 43240, at
*1 (N.D. Ill. Jan. 6, 2005).

    In resisting Pfizer's discovery requests, the Journals first
argue that the documents and information identified in the
subpoena riders is irrelevant to the issues raised in the MDL.
To be relevant, the discovery sought need not be admissible at
trial; it need only be reasonably calculated to lead to the
discovery of admissible evidence. Fed. R. Civ. P. 26(1). *See
also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351
(1978)(interpreting "relevance" broadly to include any matter
that bears on, or that reasonably could lead to other matter that
could bear on, any issue that is or may be in the case).

4

The Journals argue that the MDL involves claims alleging consumer fraud and unjust enrichment, not strict liability or design defect, and that the MDL claims are based on statements Pfizer actually made and things Pfizer actually knew; thus, information that Pfizer did not know about – e.g., the confidential peer review evaluations sought in the subpoenas – is irrelevant.  In fact, the first case set for trial in the MDL, which is scheduled to begin on May 5, 2008, does involve a strict liability claim, as well as claims of negligence, breach of warranty, fraudulent misrepresentation and concealment and unjust enrichment.  *See Haslam v. Pfizer*, No. C 06 2145, Complaint (attached as Exhibit B to Pfizer's Reply Brief in Support of its Motion to Compel).  Haslam alleges, *inter alia*, that Pfizer "either intentionally ignored or recklessly disregarded current medical knowledge," Complaint, ¶23; that Bextra was "unsafe for normal or reasonably anticipated use" and "defective in design or formulation," *id.*, ¶¶78-79; that it was defective "due to inadequate warnings, and/or clinical trials, testing and study, and inadequate reporting regarding the results of the clinical trials, testing and study," *id.*, ¶82.

But the Court agrees with the Journals that information kept confidential from Pfizer, the general public and the medical community at large, is irrelevant to these claims.  Pfizer appears to be fishing for documents that might possibly contain

5

something to counter what was reflected in the medical
literature.  But this is not enough  - especially because the
Court does not see (and Pfizer has not explained) how unpublished
information could help defend against claims based upon what was
known in the medical community at the time of the alleged
injuries.

In the subpoenas, Pfizer seeks, among other things,
comments, analyses and evaluations written by the "peer"
physicians and scientists who reviewed the various articles and
manuscripts relating to Bextra and Celebrex that were submitted
(whether accepted or rejected) to JAMA and AIM.  If Pfizer had
reason to believe that the peer review analyses would actually
counter the MDL plaintiffs' allegations about what it knew or
should have known, based on the medical literature available, it
surely would have said so.  And it has not.  Pfizer has argued
simply that the subpoenaed documents are reasonably likely to
lead to the discovery of admissible evidence in the product
liability cases because they relate to "study results, hypotheses
and biological explanations and causal relationships regarding
Celebrex and Bextra; Pfizer's involvement in scientific
publications; and Pfizer's responses to scientific publications."
See Motion to Compel, pp. 8-9; Reply in Support thereof, p. 3.
But with regard to the first issue, it would seem that the
published articles themselves would satisfy the request, and

6

Pfizer has not sufficiently explained what the peer review comments or rejected articles would add.  And with regard to "Pfizer's involvement in scientific publications" and "Pfizer's responses to scientific publications," this evidence would seem to be just as easily accessible from Pfizer as from the Journals. Especially given the strong policy behind preserving confidentiality in the peer review process, the Court finds that any probative value would be outweighed by the burden imposed on the Journals in invading the sanctity of that process.

With regard to the burden on the Journals in complying with the subpoenas, the Court first notes that the documents described in the subpoena rider fall within a fairly narrow range, both in terms of time and scope; the subpoenas seek documents relating to just two medications, Bextra and Celebrex, and a large portion of the documents sought were written, submitted or published within the last few years (though some date from as early as 2000).

The bigger issue is that complying with the subpoenas would require the Journals to produce documents and information that has historically, deliberately and necessarily been kept confidential.  Indeed, according to Catherine DeAngelis, a board-certified and licensed pediatrician who serves as the Editor-In-Chief of JAMA, that promise of confidentiality is what allows the peer review process to work in the first place.  *See* Declaration of Catherine D. DeAngelis, MD, MPH, in Support of Response to

7

Motion to Compel Production of Documents, ¶¶19-23, 25 (attached
as Exhibit 2 to The Journals' Response to Pfizer's Motion to
Compel).  Dr. DeAngelis represents in her declaration that, if
the Journals are forced to produce the peer reviewers' comments,
evaluations and analyses, the medical community will "suffer a
severe decline in medical reviewers willing to accept additional
requests to participate in peer review," which will inevitably
lead to an erosion in the Journals' ability to "properly
discharge its mission to advance the betterment of public
health."  DeAngelis Declaration, ¶¶25-29.  Although her
statements are quite dramatic, it is not unreasonable to believe
that compelling production of peer review documents would
compromise the process.  Pfizer has offered nothing to counter
these very real concerns; nor has it explained how redacting the
names of the "peers" would stem that tide.  Because of this, the
Court finds that whatever probative value the requested documents
may have (and it is little, if any) is outweighed by the burden
of compliance.

Given the Court's findings concerning relevance and undue
burden, the Court may decline to compel production of the
requested documents without even reaching the question of
privilege.  Nevertheless, the Court notes that the two privileges
asserted by the Journals - namely, the Illinois Reporter's

8

Privilege and the Illinois Medical Studies Act privilege – would not seem to apply here.

The Illinois Reporter's Privilege Act protects from disclosure "the source of any information obtained by a reporter"; the statute defines "source" to mean "the person or means from or through which the news or information was obtained." 735 ILCS 5/8-901, 5/8-902. Although the identities of the peer reviewers would clearly fall within the scope of this definition, *see Cukier v. American Medical Association*, 630 N.E. 2d 1198 (Ill. App. Ct. 1994), Pfizer has made clear that it is not seeking that information. Rather, Pfizer is merely concerned with the information itself, and that is not protected.

The Journals cite *People v. Slover* for the proposition that the definition of "source" is broad enough to include the entire peer review process, since that is the "means" through which the "news" is created. This reading of the statute is overly expansive. *Slover* holds that "source" means more than just names and identities of witnesses or informants, and that when the news is obtained by means of photography, the photographs fall within the Act's protection. *People v. Slover*, 753 N.E.2d 554, 557-58 (Ill. App. Ct. 2001). But it would take a great leap in logic to read *Slover* to mean that the entire peer review process and any information obtained in that process is protected from disclosure

as a "source" of the news.  And, absent clearer guidance, this Court would be disinclined to make that leap.

The Medical Studies Act, 735 ILCS 5/8-2101, provides that

> [a]ll information, interviews, reports, statements, memoranda, recommendations, letters of reference or third party confidential assessments of a health care practitioner's professional competence, or other data of the Illinois Department of Public Health, . . . Illinois State Medical Society, [or] allied medical societies . . . used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting , limiting or revoking staff privileges or agreements for services . . . .

735 ILCS 5/8-2101.  The purpose of the Act is to "ensure that members of the medical profession can maintain effective professional self-evaluation and to improve the quality of healthcare." *Giangiulio v. Ingalls Memorial Hospital*, 850 N.E.2d 249, 260 (Ill. App. Ct. 2006).  To that end, the Act clearly protects from disclosure information gathered in the course of a peer review, but only if it is used in connection with a program or study designed to improve internal quality control or patient care, or to reduce morbidity and mortality.  *Id.*  Putting aside the question of whether the Journals would qualify as "allied medical societies," the Court is not persuaded that the specific information identified in the subpoenas fits within this definition.  In her declaration, Dr. DeAngelis represented that

10

JAMA "publishes scientific articles, commentaries, and news involving all fields of medicine, including medical research, significant clinical observations, diagnostic and therapeutic developments, legal and social matters of interest to physicians, and issues of medical ethics"; JAMA's motto, she said, is "to promote the science and art of medicine and the betterment of the public health."   DeAngelis Declaration, ¶¶12-13.   A lofty goal – but one that far transcends the provisions of the Medical Studies Act.   The Act protects from disclosure documents only when "used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation"; surely not everything published in JAMA and AIM – or everything considered for publication – can fairly be described this way.   And, on the limited record before it, the Court cannot say that all of the documents requested in the subpoenas can be either.

## Conclusion

For the reasons explained above, the Court finds that whatever probative value the subpoenaed documents and information may have is outweighed by the burden and harm that would result if the Journals are forced to comply with those subpoenas. Accordingly, the Court denies Pfizer's Motion to Compel [#1].


Dated: March 14, 2008        E N T E R:


ARLANDER KEYS
United States Magistrate Judge

12